DISCIPLINARY COUNSEL *v.* McNAMEE.

[Cite as *Disciplinary Counsel v. McNamee,*
119 Ohio St.3d 269, 2008-Ohio-3883.]

(No. 2008–0400—Submitted March 12, 2008—Decided August 7, 2008.)

**Per Curiam.**

{¶ 1} Respondent, Michael Patrick McNamee of Beavercreek, Ohio, Attorney Registration No. 0043861, was admitted to the practice of law in Ohio in 1990. The Board of Commissioners on Grievances and Discipline has recommended that we suspend respondent's license to practice for one year, conditionally staying the suspension, based on findings that he entered into business transactions with clients and represented their competing interests in those transactions, creating conflicts of interest in violation of the Code of Professional Responsibility. We agree that respondent committed professional misconduct as found by the board and that a one-year suspension, all stayed, is appropriate.

{¶ 2} Relator, Disciplinary Counsel, charged respondent in a two-count complaint with various violations of the Disciplinary Rules. A panel of three board members considered the case on the parties' consent-to-discipline agreement. See Section 11 of the Rules and Regulations Governing Procedure on Complaints

and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Accepting the agreement, the panel found the misconduct to which the parties stipulated and recommended the one-year suspension, all stayed on the condition that respondent commit no further disciplinary violations. The board adopted the findings of misconduct and recommended sanction.

## Misconduct

{¶ 3} Both counts of the complaint arose from a real-estate development project in which respondent represented three investors and also had a personal financial interest.

### Count One

{¶ 4} In 1992, respondent and his siblings owned approximately 80 acres in Xenia Township, Ohio. Respondent, then an associate with the law firm of Pickrel, Shaeffer & Ebeling ("PS & E"), agreed to develop the McNamee property in a joint venture with Robert S. Arnold, a local builder and long-time client of the PS & E law firm.

*The Arnold–McNamee Joint Venture*

{¶ 5} In January 1993, respondent transferred the McNamee property to the Arnold–McNamee Joint Venture ("Arnold–McNamee") with plans to develop Summer Brooke, a series of single-family housing units, and to share in profits from the sale of those properties. Arnold–McNamee valued the development land at $250,000, or $3,125 per acre. According to the Arnold–McNamee agreement, respondent agreed to "manage all of the legal affairs of [Arnold–McNamee], review all contracts awarded for development of the Premises, and assist Arnold as required with the operation of [Arnold–McNamee]."

{¶ 6} Acting on behalf of Arnold–McNamee, respondent succeeded in having the McNamee property rezoned and annexed to the city of Xenia. Under the new zoning, however, restrictions limited the development to 100 lots unless the developers constructed a second point of access to a main thoroughfare. To obtain a site for the second entrance, respondent contacted neighbors John and Damaine Vonada, who owned approximately 40 acres contiguous to the McNamee property, about becoming involved in the Summer Brooke development project.

{¶ 7} Respondent explained to the Vonadas that he was an attorney and had joined Arnold in a venture to develop more than 100 new housing units on the McNamee plat. He then explained zoning restrictions and Arnold–McNamee's need for a second entrance off the main road bordering the couple's land. The Vonadas did not immediately commit to the Summer Brooke project, but respondent prevailed upon them. When they did commit, the couple inquired about possibly buying some Summer Brooke lots to develop themselves.

*The Arnold–Vonada Joint Venture*

{¶ 8} During their negotiations, respondent urged the Vonadas to enter into a joint venture with Arnold. The Vonadas' accountant advised against that arrangement, recommending instead that the couple protect their personal assets by forming an S corporation. The Vonadas disregarded the accountant's advice, relying instead on respondent's assurances that they needed no corporate shield and that any lawsuits against the venture would target only Arnold, because of his "vast wealth" and "deep pockets."

{¶ 9} In April 1993, respondent prepared the Arnold–Vonada Joint Venture ("Arnold–Vonada") agreement, which generally tracked the terms of the Arnold–McNamee agreement, including valuation of the properties. Respondent knew that the Vonadas had purchased their property in 1989 for $47,765.31, or $1,194.13 per acre, but did not advise the Vonadas to get an appraisal. Instead he priced the Vonada property at $3,125 per acre—the same as the McNamee property—for a total of $125,000.

{¶ 10} The Arnold–Vonada agreement also provided some terms that were not in the Arnold–McNamee agreement, including an option allowing the Vonadas to buy three lots on which to build homes. The Arnold–Vonada agreement also provided (1) that the Vonadas were aware that Arnold had "entered into a similar joint venture agreement with contiguous property owners, to wit, the McNamees," (2) that the McNamee property would be developed first, but (3) that Arnold would "begin development of the [Vonada property] on or before the sale of the first seventy-five (75) residential lots of the McNamee property."

{¶ 11} In preparing the Arnold–Vonada agreement, respondent recommended that he perform the legal work necessary to annex the Vonada land to the city as part of the Summer Brooke development. In late April 1993, he sent the Vonadas an engagement letter quoting a $4,500 flat fee for his services in the anticipated annexation and rezoning process. The Vonadas paid the fee. They also paid $900 that respondent charged for negotiating the formation of Arnold–Vonada.

{¶ 12} Except as permitted under the DR 2–101 standards for advertising, DR 2–103(A) prohibits a lawyer from recommending his or her employment, as a private practitioner, to a nonlawyer who has not sought the lawyer's advice regarding employment of counsel. Respondent conceded that he had violated this rule by recommending himself as the Vonadas' legal representative for the Summer Brook development project. We find him in violation of DR 2–103(A).

{¶ 13} DR 5–101(A)(1) prohibits a lawyer, except with the client's consent after full disclosure of attendant risks, from accepting employment if the lawyer's professional judgment will or reasonably may be affected by the lawyer's own interests. DR 5–104(A) prohibits a lawyer, except with the client's consent after

full disclosure of attendant risks, from transacting business with a client if they have differing interests, and the client expects the lawyer to exercise his professional judgment for the client's independent interests. Respondent stipulated that he had violated these rules by never alerting the Vonadas to the potential conflicts in his representing all sides to the Summer Brooke development project or advising them to obtain independent counsel. We find him in violation of DR 5–101(A)(1) and 5–104(A).

### Count Two

{¶ 14} Beginning in January 1994, respondent represented both Arnold–McNamee and Arnold–Vonada in a series of transactions, usually acting in his or Arnold's interests and always without providing the disclosures necessary when attorney-client interests diverge. The parties stipulated to these transactions and conflicts, including:

{¶ 15} 1. In 1994 and 1995, respondent sold the Vonadas three Summer Brooke lots belonging to Arnold–McNamee, all at a profit. Respondent also charged the Vonadas for finalizing one of these sales and for preparing a purchase agreement for the sale of their first new construction.

{¶ 16} 2. In August 1994, after annexation, respondent filed papers for the incorporation of the Vonadas' construction company, Classic Custom Homes, Inc. He listed himself as statutory agent and afterward represented the company.

{¶ 17} 3. In 1996, respondent and his sister conveyed approximately 52.3 acres of undeveloped McNamee land to Arnold for a total purchase price of $370,000, or $7,000 an acre. In exchange for his $250,000 share of the conveyance, respondent accepted title to a house that Arnold owned. The Vonadas knew nothing of these transfers.

{¶ 18} 4. In 1997, after the sale of three lots belonging to Arnold–Vonada, the Vonadas anticipated payment of $13,493.19 under the terms of the joint venture agreement. When the Vonadas sought payment, respondent contacted them to discuss the distribution, informing them that he had been asked to talk with them on Arnold's behalf.

{¶ 19} It was during this conversation that the Vonadas learned for the first time that respondent had been representing Arnold and the Vonadas simultaneously. Obviously advocating on Arnold's behalf, respondent related that he had "worked with Bob Arnold since 1989 and had been through thick and thin with him," that Arnold needed "some latitude and compromise on the distributions of the cash proceeds from the sale of the lots," and that Arnold "wanted to use the lot revenues to pay back Arnold's capital account in the Summer Brooke development rather than paying the Vonadas." Further demonstrating his divided loyalties, respondent warned the Vonadas that if they fought Arnold,

"they could find themselves getting 'dog' lots, rather than 'premium lots'" on which to build their Classic Custom homes and admonished that they "should be grateful that Arnold was giving them the opportunity to turn the 'dirt' they owned into a 'damn good investment.'"

{¶ 20} The Vonadas at this point questioned respondent about the conflicting interests at stake between the principals in the Summer Brooke development project. Respondent replied that he saw no conflict but would withdraw if one arose unless the Vonadas and Arnold agreed to his representation and signed waivers. Respondent never presented waivers to his clients.

{¶ 21} 5. Continuing to represent all sides of the Summer Brooke development project, respondent prepared in February 1998 a limited-liability partnership agreement between the Vonadas and Arnold Development, Inc. Without advising the Vonadas, respondent named Arnold the authorized partner and himself the statutory agent. He also registered the partnership with the secretary of state before the Vonadas signed the filing.

*The Vonadas Retain Independent Counsel*

{¶ 22} The Vonadas finally retained independent counsel. In January 2001, attorney Robert Miller expressed his grave concerns to respondent about the Vonadas' representation in the Summer Brooke development. In an attempt to rationalize his competing roles, respondent wrote back:

{¶ 23} "I represent Arnold Enterprises and various entities owned or controlled by Robert S. Arnold. I've also represented both Arnold and [the] Vonada[s] (with full disclosure and waiver of conflicts) during the negotiation of their joint venture agreements. The Vonada joint venture agreement was based almost exactly on the joint venture agreement between myself and Arnold for property that I formerly owned contiguous to the Vonadas' property. I indicated that I would serve as a conduit for information in this matter and will withdraw should the parties not be able to resolve their misunderstandings."

{¶ 24} But respondent did not withdraw. He continued to represent Arnold despite accusations of wrongdoing and conflicts of interest from Miller and the Vonadas' accountant. Respondent persisted even after the parties met in July 2001 to discuss resolving their differences, at which point Damaine Vonada admonished respondent that he should have withdrawn back in September 1997. Respondent abruptly ended that meeting but then still tried to broker a settlement over the next six months, yet again advocating on Arnold's behalf.

{¶ 25} In February 2002, respondent sent the Vonadas a $79,903.69 check drawn from funds that Arnold had provided, representing proceeds from lot sales. Respondent demanded that the Vonadas "convey title to their property into the name of the joint venture as required by the joint venture agreement."

Respondent made this demand notwithstanding that he had continued to serve as legal representative and statutory agent for the Arnold and Vonada partnership and for Classic Custom Homes, Inc.

{¶ 26} Respondent finally withdrew as counsel for Custom Homes in April 2002. He continued, however, to act on behalf of the Arnold and Vonada partnership, sending annual reports to the principals for 1998 through 2002. Miller advised the Vonadas to return the reports unsigned. In May 2003, after the secretary of state canceled the Arnold and Vonada partnership for failure to file annual reports, respondent filed the reports without the Vonadas' consent.

*The Vonadas Obtain Successor Counsel*

{¶ 27} Miller died in July 2003, and the Vonadas' problems with respondent and Arnold persisted. In September 2003, the Vonadas discovered that Arnold had committed to sell four parcels, located in part on Vonada property, to third parties. No one had obtained the couple's consent to the sales as required under Arnold–Vonada and their partnership. In one instance, an Arnold-owned enterprise executed a contract to sell a lot for which the Vonadas held title and immediately began constructing the buyer's home. In October 2003, respondent tried to convince the Vonadas to convey title to that parcel by threatening litigation. Respondent then served the Vonadas with a demand for arbitration, in effect suing to enforce agreements that he had urged them to enter and had prepared for them. The Vonadas hired attorneys David Greer and Jennifer Hill, who responded to the arbitration demand and, in December 2003, called for respondent's withdrawal. Hill wrote:

{¶ 28} "Finally, Mr. and Mrs. Vonada have concerns with your representation of any party in this matter. As you previously represented Mr. and Mrs. Vonada, a conflict of interest exists with your representation of Arnold Development, Robert S. Arnold and/or Robert M. Arnold in this arbitration proceeding. We also understand that you have represented both Vonada–Arnold Enterprises and Vonada–Arnold Enterprises PLL, which raises additional conflict issues, as the Vonadas are parties to both those entities. The Vonadas are not willing to waive the existing conflicts. As a result, we request that you discontinue representation of Arnold Development, Robert S. Arnold, and Robert M. Arnold in this matter and refer those parties to new counsel."

{¶ 29} Respondent still refused to withdraw, and Greer moved to disqualify him. Respondent deposed Damaine Vonada in anticipation of a hearing on the motion, and Hill deposed him. Respondent repeatedly refused to answer questions about representing the Vonadas, insisting that the Vonadas had not sufficiently waived the attorney-client privilege.

{¶ 30} The arbitration panel eventually disqualified respondent because he would likely be a witness in the proceedings, but not before the Vonadas had

incurred significant expense. The parties ultimately resolved the dispute over the Summer Brooke development, with Arnold agreeing to purchase the Vonada property. The arbitration panel then conducted a hearing solely to determine the property value.

{¶ 31} DR 1–102(A)(5) prohibits a lawyer from engaging in conduct prejudicial to the administration of justice. DR 5–101(A)(1) prohibits a lawyer from accepting employment if the exercise of professional judgment will or reasonably may be affected by the lawyer's own interests. Except in circumstances not relevant here, DR 5–101(B) precludes a lawyer from representing a client in contemplated or pending litigation if the lawyer knows or should know that he or she ought to be called as a witness. DR 5–104(A), as discussed, precludes a lawyer from transacting business with a client where their interests compete and the client has not waived the conflict. Finally, DR 5–105(B) prohibits a lawyer from continuing to represent two or more clients who have conflicting interests, unless the clients consent after full disclosure of attendant risks.

{¶ 32} Respondent continued to represent all sides to the Summer Brooke development despite obvious conflicts of interest that he never disclosed to his clients and that they never waived, despite repeated calls for his disqualification, and despite the likelihood that he would be called as a witness. Respondent stipulated that he had thereby violated DR 1–102(A)(5), 5–101(A)(1), 5–101(B), 5–104(A), and 5–105(B). We find respondent in violation of these rules.

Sanction

{¶ 33} Respondent represented multiple parties to a business venture in which he also had a significant financial interest without proper disclosures and then exacerbated the situation by continuing in these roles after the alliance had begun to unravel. We saw the same misconduct in *Columbus Bar Assn. v. Mills*, 109 Ohio St.3d 245, 2006-Ohio-2290, 846 N.E.2d 1253, in which a lawyer represented two married couples in structuring limited-liability and corporate enterprises. That lawyer negotiated a buyout on behalf of all parties when relations soured and then continued to represent some of the parties even after a lawsuit ensued. For placing her clients' interests and confidences at risk, we suspended the lawyer's license to practice for one year, but stayed the suspension with conditions, including no further misconduct.

{¶ 34} Mitigating evidence in *Mills* showed the lawyer's lack of a prior disciplinary record, cooperation in the disciplinary proceedings, and her good character and reputation apart from the misconduct. 109 Ohio St.3d 245, 2006-Ohio-2290, 846 N.E.2d 1253, ¶ 18. See BCGD Proc.Reg. 10(B)(2)(a), (d), and (e). The parties stipulated to the presence of these factors here, and respondent acknowledges his wrongdoing. The sanction imposed in *Mills* is therefore also appropriate in this case.

{¶ 35} We suspend respondent from the practice of law in Ohio for one year but stay the suspension on the condition that he commit no further misconduct. If respondent violates the condition of the stay, the stay will be lifted, and respondent will serve the entire one-year suspension. Costs taxed to respondent.

Judgment accordingly.

PFEIFER, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., dissent.

---

**MOYER, C.J., dissenting.**

{¶ 36} In view of the respondent's conduct, I would reject the recommended sanction and, pursuant to Gov.Bar R. V(8)(D), remand this cause to the Board of Commissioners on Grievances and Discipline for further proceedings. I would further order that these proceedings include consideration of an increased degree of discipline. For the foregoing reason, I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

Bradley N. Frick, for respondent.